May it please the court, my name is Linda Larson. I represent the Alaska Seafood Group of Appellants here. I'm arguing today on behalf of my clients and appellants, State of Alaska and Freezer Longline Coalition. I'll reserve three minutes for rebuttal. The issue here is whether NIMS properly applied the ESA Section 7 Jeopardy and Adverse Modification Standards to the proposed reauthorization of previously mitigated fisheries in Alaska. In this consultation, the agency was not attempting to avoid harm to stellar sea lions. Instead, the agency's action, as expressed in the interim final rule, was aimed at accelerating the pace of stellar sea lion recovery. NIMS takes the unprecedented position in this action that it need not even show harm to the species in order to find jeopardy. That cannot be the law. The ESA... Ms. Larson, I'm a little bit confused by your argument. Is your position that the agency did not find that there was potential jeopardy to the survival and recovery of the species? It found jeopardy, yes. It recited the regulatory standard, but it actually argues in its brief that it, at page 39, that it hasn't our case law suggested that the agency has to look both at the species survival and recovery in order to make a determination of an adverse impact based on implementation or regulation? You absolutely have said that a jeopardy determination requires consideration of both survival and recovery. Okay, so it's both conservation... I mean, we're dealing with a listed endangered species here, right? So the agency has to be especially cautious in doing and finding no impact on fishing regulations, which its scientists are worried may adversely impact the habitat for the stellar sea lions. Okay, I think there's several components to that question. There are. So maybe I can sort of take those in order. You can... I'll sustain your objection to the compound and answer my question. Take it any way you want. That's a very complicated proceeding. It is. Okay, so in a jeopardy analysis, the agency must consider both survival and recovery. But what this court has made very clear in National Wildlife Federation and in Salmon Spawning and Recovery, that the key finding is that the proposed action has to cause some new jeopardy and some new level of harm. And what happened here was the agency was looking at a stellar sea lion population in the western DPS that, during the period that the previous mitigation measures were in effect, had undergone a significant positive change for the better. The declines of the 1980s and 90s had stopped. The species had leveled off and it was making a slow 1.4% year annual rate towards recovery. But wasn't the goal 3% per year? That's the goal to delist it. Right. The goal to downlist it is 1.5% over 15 years. And part of the problem here is that NIMS took a look at a snapshot of time, eight years, and said, you know what? They haven't actually met the 15-year criteria of 1.5%. And sometimes they say they haven't met the 3%. But the recovery plan allows them 30 years to get there. And that's a huge problem here. I guess the concern I have with your argument is, because of the fact that we're dealing with an endangered species, the agency, based on what you say, is an inadequate period of time, is concerned because the sea lions are not growing as fast as the agency would like to see them grow. And we know that they're climbing back from relatively low levels compared to what happened in prior decades, from whatever the cause. Right. So why does the agency with an endangered species have to take the risk that, if they're wrong, the stellar sea lion population might further be harmed? Why shouldn't it take a more prudent course of staying fishing operations for some period of time in order to see whether that might bring an improvement in the rate of recovery? I actually think you just stated what the legal standard is, and that's what they didn't follow. Well, I'm not... I'm still having trouble with... I mean, we've stated the legal standard that, you know, comes out of the National Wildlife Federation case. And survival and recovery are intertwined... Correct. ...in this analysis. So it seems that... And Nymphs cited that. And you're saying they went wrong because there's a further requirement of harm that they didn't document? No. I'm saying that they can't rationally conclude on the record that the previous mitigation measures harmed stellar sea lions when stellar sea lions stabilized and increased during the period in which they were in effect. I'm also saying that they didn't make the basic causation finding that's required by Section 7A2. You've stated in National Wildlife Federation that jeopardize actually requires a comparative effect, and it requires some new depth of harm that is caused by the action. And here we have a situation where the agency states throughout the BIOP that it does not know whether fisheries cause harm to stellar sea lions. And so basically what it said was, because I can't conclude... I can't get to a no jeopardy conclusion, I'm required to make a jeopardy conclusion. And I don't think that's how that works. That's mixing and matching 7A2 and 7B3A. Would your position be the same if the rate of recovery was only one-tenth of one percent? Yes, because the recovery plan says that... And this is the problem that the agency is being inconsistent with its own prior scientific conclusions. The recovery plan says, given the fact that we've had substantial declines in this population, a leveling off in the population trend would represent a significant risk of lessening of the risk of extinction. And in the biological opinion, the agency says, that's not good enough. That's an unacceptably high risk of extinction. And they never reconcile the two competing statements. Okay, but I think what we're all having trouble with is that you have an already endangered species. And you seem... The thrust of your, at least what I'm having trouble with, the thrust of your argument seems to be that they can't take any action to try to improve the ability of the species to survive unless they can show that there has been a decline in the entire population. Not simply that it's not recovering at a high enough rate. That seems to be the thrust of your position. I'm having a little trouble accepting that where you have an already determined to be endangered species, that if it shrinks anymore, faces extinction. Well, first of all, if you are on the endangered species list, by definition you're endangered. So again, you have to have some new jeopardy that's caused by the proposed action in order to make a jeopardy finding. So that's the legal standard. And what happened here was, the agency said, we can't tell if the improvement in the species status was caused by or was coincidental with the What they do is say, we're going to ratchet down on the fisheries based on the potential for further harm. And you've said repeatedly, that's not enough. That's not good enough. You cannot make a jeopardy finding based on the potential for harm. And I think what you're really asking is, what do we think the agency should have done, do here? And what they should have done is do what the law and the regulations say they should do, which is monitor the And if there was, in fact, a decline in the species at the species level, at that point, they would have reopened consultation. But what they can't do is say, you know what, we're worried that this positive increase in the species might not continue. So therefore, we're going to find jeopardy now and say that the already mitigated fisheries have to be mitigated. So it has no, there are no more subtle tools it can use to help an already endangered species recover faster. Not under the regulations. So in other words, because they can't, I mean, they say that this elusive connection may never, ever be made. And yet, they have some scientific data that suggests that, obviously, there's connection between survival and certain fish. But you're saying that their uncertainty isn't enough to give them any regulatory authority, because they haven't made the correct findings, or they can't make the correct findings. What I would say is, in this particular situation, it's not, actually not, a case of equivocal evidence where they're trying to make a scientific judgment about it. They've spent $190 million in the 2000s studying stellar sea lions. There were eight studies in the 2000s trying to find a causal connection between the fisheries and the status of stellar sea lions, and they cannot find that causal connection. And so you've said, repeatedly, that you don't defer to the agency when they're making, basically speculating on no evidence. Let me ask a hypothetical. Suppose that we were looking at 30-year data, and the species had only increased by a tenth of a percent each year over that 30-year period. Would your position still be the same, that the agency would be powerless to impose the restrictions on fishing? Yes, they would be powerless to impose restrictions on fishing, unless they could show there was some causal connection, some, you know, the fisheries have to jeopardize the stellar sea lions. And I think part of the problem in this consultation is the Section 4 standards got confused with the Section 7 standards. The Section 7, Section 4 standards are a broader question, and the question is, so in your 30-year hypothetical, they're not, they haven't recovered to the number that we wanted them to recover to. So the question is, is that a sufficient population with enough viability and reproductive potential that we can remove the protections of the act from them? That's the classic recovery. And the answer, I assume, would be clearly no. Well, no. I think that what the agency says is that because we have different causes acting in different decades, and we're not really sure what's suppressing the population and what's allowing it to improve, we'd want to study that before we downlisted it or delisted it. So how do we... That's it, you're talking Section 4 now, right? Section 4. As opposed to Section 7. Right. And so I was going to get to Section 7. So in Section 7, if you're at the 30-year mark, and they say they've just, let's say they've topped out at 47,000 animals, then the agency would still have to say, okay, let's look at the fisheries and see if, at this point, we can make a causal connection between prey availability and the status of stellar sea lions. And the thing to keep in mind in this consultation here is that it's very irrational for them to conclude that there is a direct link between amount of prey removal and the status of stellar sea lions because you have this extreme variability in what's happening in the subpopulations, and you have fishing in all of those subregions. But if there is, what does this record show with respect to pups not getting enough to eat? What the record shows is that pups are thriving, that they're large, that they appear to be surviving, but for some reason, the rate of natality is not what the agency would like it to be. So there aren't enough being born? Well, that's not even clear. The agency, in trying to evaluate whether chronic nutritional stress was occurring or not occurring, which, by the way, they still don't even know if it is or not, had data to look at 14 factors. They looked at those 14 factors, and only one of them, reduced natality, showed that it was present. All the rest of those factors were not present. So, again, it's a hypothesis that chronic nutritional stress is occurring, followed by a hypothesis that if it's occurring, it's being caused by the fisheries. And that's speculation, and you do not need to defer to that. Okay. I'd like to spend a minute on adverse modification because I think our audience will appreciate a legal one. What happened here was the agency admits that it did not apply the regulatory standard for adverse modification. It admits that it did not consider whether the proposed action would appreciably diminish the value of critical habitat because it contends that the regulatory definition is invalid. The government's position is wrong as a environmental made it clear that this court has not invalidated the appreciable diminishment component of the regulation. Adverse modification occurs only when there is a direct or indirect alteration that appreciably diminishes the value of critical habitat. The court issued both before the draft and final by-ops were issued, and the government never addresses it, either in the biological opinion or in its briefs. What do we do with the district court's finding that, for want of a better term, they came close enough? Close enough? Yeah. Well, they didn't come close enough because the standard that they used, whether the critical habitat is likely to remain functional or retain the ability to become functional to conserve the intended conservation role, completely reads out the appreciable diminishment component of it. It reads out the incremental harm component of it. Under the regulations and the case law, the direct or indirect alteration must considerably reduce the value of critical habitat, and it must be more than just perceptible. But the standard that they set up would let any alteration in critical habitat be an adverse modification, and they cannot read out that incremental effect. And I see that I have less than three minutes, so I will reserve that time for rebuttal. All right. Thank you. Good morning. David Gunter here from the Department of Justice on behalf of the Fisheries Service. With me at council table is Colin O'Brien from Earth Science, and I'll give him five minutes for him to make an argument on behalf of his client. In the biological opinion issue in this case, the Fisheries Service did exactly what this court says it's supposed to do when it's making decisions in areas of scientific uncertainty. It reviewed a large body of scientific evidence. It examined both the prospects for survival and recovery of this endangered species. It acknowledged the conflicting data and the fact that there is scientific disagreement about these issues, but it used its expertise to draw the best conclusion that it could based on the data that was available. Perhaps most importantly, it gave the benefit of the doubt to the endangered species here. Under the ESA, in order to reauthorize the existing fishery management measures for these waters, the Fisheries Service has to ensure that they are not likely to jeopardize the stellar sea lion. If the evidence doesn't allow the Fisheries Service to make that affirmative conclusion, then it has to implement a reasonable and prudent alternative, such as the interim final rule that it would be among the thinnest data I've seen over the years. And when you have language like there's no leading hypothesis to explain the decline, the analyses fail to show statistically significant impact of the fisheries, etc., there's an elusive cause-and-effect connection. That kind of language is pretty troubling. So if I get your argument, you're saying, well, since the really is no evidence, and since it's an endangered species, the service has to do something. Is that basically what you're saying? Well, I disagree on this record that there's no evidence. It's true that the Fisheries Service acknowledged that it can't conclusively draw a line between fisheries activity and the decline of the stellar sea lion. That's baldly stated in the conclusion to the Jeopardy! analysis on page 345 of the Biological Opinion. But it said that weight of the evidence and a precautionary and measured approach, it still needs to make a Jeopardy! finding. And on the weight of the evidence, the Fisheries Service, I think, in the Biological Opinion, really grappled with what the evidence is for and against. For example, it said that not all scientists agree that nutritional stress is a problem, and that there is data inconsistent with that theory. But it also said that the data inconsistent with the nutritional stress theory, for example, comes from areas to the east of the Aleutian Islands, whereas the primary driver of its concern for the species here and its Jeopardy! finding was in the steep decline, more than 40% in just eight years, in the western Aleutian Islands. So the agency does have to have evidence to support its conclusion, but the agency also gets deference in how it interprets that evidence. It simply has to explain in the record why it has drawn the conclusion that it did. Now the other thing to point out that your question raises the issue of is the Fisheries Service specifically said we need to take a precautionary and measured approach here based on the evidence, and that comes directly from the ESA standard itself. The ESA is precautionary, and we've heard the plaintiffs argue this morning that this buyout should be overturned because the Fisheries Service could not find that there is harm. But in fact, the ESA establishes the opposite standard. Unless the agency can find that there is not likely to be harm, then it has to go forward with the reasonable and prudent alternative, and that's just what it did here. Now to allay, and incidentally it also found that there would be additional harm, contrary to counsel's assertion, that's on page 344 of the Biological Opinion. It said we find that the proposed action is likely to present additional harm due largely to the indirect effects in the western and central Aleutian Islands. So that finding is in the record. But let me go through some of the key points in the record that support the Biological Opinion here, and draw a line directly from the data through the jeopardy determination to the reasonable and prudent alternative. The agency obviously looked at a large volume of data here, but what I want to highlight in the record is on Biological Opinion page 332. The discussion of trends of overall abundance and sub-regional abundance of the Steller sea lion. Between 2008, the western DPS of Steller sea lions did not show any statistically significant improvement. It showed 1.4% over those years, which not nymphs, but the scientific studies that it relied upon, said was not statistically significant. And in fact, you can see graphs in the record showing the range of population that that number might represent. Some of which, that range falls below 0% in some instances and could be negative population growth. So at the same time that that population was statistically remaining roughly stable, the western Aleutian Islands population declined more than 40% between 2000 and 2008. Now that's on top of a 90% decline that had already taken place between 1950 and 2000. The fishery service said that the reason for this was essentially not enough pups being born, reduced natality is considered to be a primary driver, and that the most reasonable explanation, according to page 198 of the Biop, is nutritional stress. That other hypotheses that might explain the lack of a pup count have been dismissed as not being significant. Now again, the fishery service didn't say this is definitely being caused by fisheries. It said the science is not conclusive. But it pointed to evidence that suggested that fisheries were connected to this decline. For example, in the western Aleutian Islands, where fishing in critical habitat is still allowed, fishing can compete with stellar sea lions for prey resources within the three nautical miles of rookeries, that critical habitat area where breeding females are most likely to do their foraging. Therefore, as I pointed out a minute ago on page 344 of the Biop, the fishery service found specifically that reauthorizing the existing management measures would cause additional harm. Mr. Gunner, can I interrupt you? Of course. I always want to know the consequences of our rulings, and there is discussion in the briefing of the size and the value of the fishery in terms of economic loss, jobs lost, and vessels that are going to be idled. Are these measures that NMFS is proposing basically going to wipe out the entire commercial fishery for the upcoming season, or are we just talking about closing perhaps the most fertile areas of the fishery, but relegating the fleet to fish in other areas? I think we're talking about closing fertile areas, and I don't personally have the knowledge of whether they're the most fertile. But NMFS anticipates that at least some fishing activity will be able to be made up in other areas. So for example, the plaintiffs discuss some of the economic numbers that are contained in the environmental assessment. Those were premised on the assumption the environmental assessment states of a worst-case scenario, that is that fisheries will not be able to direct their fishing efforts into other areas. But are those numbers the size of the entire fishery, or the estimated loss to the fishery in terms of economic and job loss and idling of vessels? Maybe I should ask Ms. Larson. I'm sure she will know the answer. Yeah, and again, I would direct you to the environmental assessment in the excerpts of... Well, I read what I read in the assessment, but it didn't answer that question. Okay. I'm sorry. I don't know that answer myself. I will reserve it for Ms. Larson. It may discuss the total size. I know that it discusses the losses. But again, those are worst-case losses, assuming that that effort can't be directed elsewhere. And I'm not sure we have evidence in the record here about what has actually occurred in the area. I'm assuming the plaintiffs wouldn't be here if they didn't think that it was a substantial economic hit. So... You will need to ask them about that. I will pick that up on rebuttal. Okay. I want to address this point that counsel raised in her argument about adverse modification and the effect of the Butte Environmental Council decision. Butte Environmental Council is an interesting decision, and I apologize for not raising it in my own brief more directly. But since counsel has raised it in her reply, and again here, I'd like to address it. What the court did in Butte Environmental Council directly supports what the fishery service did here. Because the plaintiffs in that case argued that the wildlife service in that case had misapplied the adverse modification standard. What the court found is that the agency had not applied that standard at all. That it explicitly stated, we have not applied the adverse modification standard. And instead, it cited an agency guidance similar to the one that's in the record here, in which the agency indicated that it was concerned about the viability of that standard after Gifford Pinchot, and instead was attempting to apply a standard that would be consistent with the statute. That's exactly what happened here. And in Butte Environmental Council, the court didn't fault the agency for doing that. Instead, it did cite that adverse modification definition in the regulation 402.02. But essentially, it said that what the agency did is sufficient to satisfy what this regulation would have required. So it didn't directly decide whether the definition that was questioned in Gifford Pinchot is valid or invalid. But it did essentially what the district court did here. It said, close enough. What the agency did, whatever standard it applied, meets the standard that's stated in the regulation. And do we make any kind of a deferral to that ruling? Is that a clearly erroneous standard of review? Or are we reviewing this entirely de novo? You are reviewing it de novo. So obviously, you don't need to defer to what the district court said about whether it's close enough. But I do think that what the Ninth Circuit has already done in Butte Environmental Council is to give some sanction to the agency's efforts to deal with Gifford Pinchot in the wake of this uncertainty. And also in the wake of a Fifth Circuit decision that essentially says the appreciable diminishment standard is facially invalid. And so we have the guidance in the supplemental excerpts where the fishery service is trying to say, what do we do with this? How do we apply the standard of the statute since we're not sure that we can still apply this regulation? And what it did was to apply a standard that is, in effect, very similar to the regulatory standard as the district court found. And this court did not have a problem with that in Butte Environmental Council. I'd like to take just a minute to address the use of the recovery plan. The plaintiffs have said that the way that the fishery service used the recovery plan in this case was essentially as a surrogate for the jeopardy analysis, that it replaced the Section 4 analysis. I'm sorry, that it replaced Section 7 analysis, which is required, with a Section 4 analysis of recovery. And that's not what happened here. Instead, the fishery service used the recovery plan as a factor in its analysis, part of what it describes as a joint concept of survival and recovery. In particular, the recovery plan identifies demographic trends of overall abundance and sub-regional abundance that can help a recovery team, if necessary, or in this case, the team assessing jeopardy, can help those teams determine whether the species is improving toward a state of recovery or is declining, deepening its risk of extinction. Based on the recovery plan here, the fishery service noted that the trends in the recovery plan are going the wrong way. Now obviously, the recovery plan is backward-looking. You have to look at 15 or 30 years of progress to decide delisting and downlisting. But the demographic criteria that it sets out for the health of a species are still relevant in looking forward at what is likely to happen if the existing management measures are reauthorized. Now here, the fishery service saw the overall population trend is not measurably positive, so that fails one of the recovery plan criteria for recovery, but also that trends in the western Aleutian Islands are suggesting continued threats to the species. Those trends show how jeopardy and recovery are biologically intertwined, and in both the recovery plan and the biological opinion, the fishery service laid out some ways in which they are intertwined, in which a threat to a sub-regional population can emerge. So, that explains... I guess, let me ask about the language that I think they used there. They said it was plausible, I thought, was the language that the sub-region decline could reflect a risk for the larger. And so, I'm still having some difficulty because the kind of language used here is so diluted, if you will. So, the use of that language, for example, it's plausible, which could be translated to mean possible. Is that sufficient? And is there something else I should be looking at? I think that if it were a mere possibility, that would be sufficient. In fact, the existing management measures will cause jeopardy, and that is the ESA's... And it really is a question of the glass half full and empty. Each of you is coming at it from a different perspective, correct? And so, that's where the ESA presumption is really important. The fishery service has to implement the reasonable and prudent alternative, unless it can show that the existing measures are not likely. It doesn't have to make an affirmative finding, and in that respect, actually, this is different from a lot of agency cases, where the agency has to make an affirmative finding and show its evidence in the record. The ESA here reverses that presumption. And so, a mere possibility, I think, perhaps would be enough here. But I would hate to have this case turn just on the word plausible. I think the question for the court is, did the agency explain in the record how it got to that decision? And so, here, it's not just stating, well, we don't know one way or another, so we're going to flip a coin in favor of the species. It actually explained what it looked at to try and draw the conclusion that it did in the face of scientific uncertainty. For example, it pointed to the recovery plan, which says that decline in sub-regional population can show an unrecognized threat. It also pointed to the recovery plan, which says that maintaining biological diversity across a species' entire range is important, especially for a species that is at as high a risk of extinction as this species is. And so, the agency's findings are there to support the conclusions that it drew, even though it recognized that the data doesn't definitively point one way or another. Now, I see my time has almost expired, so unless the court has other questions about the ESA issues, I'd like to take a brief minute to talk about the NEPA remedy. The key point on this issue is that the district court found NEPA had been violated because an EIS had not been prepared. And in its injunction, it ordered the agency to prepare an EIS. That process is ongoing. The agency has taken that on remand and is meeting all of the deadlines that it's supposed to meet under the district court's orders to do that. But the question is, can the court abuse its discretion by not ordering anything further? And it didn't, because binding NEPA regulations will dictate what additional steps have to be taken after the preparation of the EIS on remand. If those regulations require additional steps, no injunction is necessary to ensure that those steps will take place. The court has to afford the agency a presumption that it will follow its regulations. And if the regulations don't require anything else, then obviously no more restrictive injunction is required than the one that the district court ordered here. So for these reasons on both the NEPA issues and the ESA issues, we urge the court to affirm the judgment of the district court. Thank you. Thank you. Good morning. I'm Colin O'Brien and I'm here on behalf of the intervener appellees Greenpeace and Oceana. And I would like to hit on four points that I First, the significance of the decline in the Western Aleutian sub-regional population and this impact on the larger Western population of sea lions. I think that was a question that you had asked Judge McEwen. Second, I'd like to highlight the legal obligations for the agency to act even in the face of uncertain information. Third, I'd like to briefly take up some facts that are implicated by the discussion about Butte and the adverse modification regulation. And then I'd like to come back to your question, Judge Tallman, about the impact on the industry. So first, some important key details. Annually, these fisheries remove in excess of four billion pounds of fish from the ocean each year. And fishing at this intensity has by design left fishery stocks at the levels of 30 to 50 percent of their historic unfished level. You're assuming the nexus in your argument, are you not? That's a nexus. I'm assuming what? I'm sorry. A nexus. Between fishing and decline. Yes. And I do think that there is support in the record for that nexus. For example... Well, the agency didn't say that. They said, we can't really tell, but we fear that it might. Therefore, we're going to be cautious in our approach. Well, I think it's important to distinguish between studies that tried to prove cause and effect and studies that highlighted the correlation between competition in the fisheries and the welfare of stellar sea lions. And here, I would note that the biggest, grandest experiment that is acknowledged in the biological opinion is the differential experiences that have been observed in the western and central Aleutians versus the rest of the range. In the early 2000s, substantial restrictions were imposed on the fishery in order to benefit stellar sea lions, at least in certain sub-regions. But as we point out in our brief, the same restrictions were not imposed in the western and central Aleutians. And lo and behold, in those areas where the lesser protection measures were not instituted, sea lions are not doing as well. And to support those facts, I would direct your attention to several spots in the record. First, if you look at volume five of the excerpts of record, page 1224, I would also encourage you to look at excerpts of record, page 1229. And then there is a really excellent visual depiction in the excerpts of record, volume six, at 1393. And so I think that there are several facts that are clear. Not only this big experiment, but the fish species taken by the fisheries are the same that are relied upon by sea lions for prey. And as I've pointed out, this grand experiment of differential protections has shown that the areas where measures have not been instituted, where the fishing restrictions have been the least significant, the sea lions have continued to decline. In the western Aleutians... Mr. O'Brien, you're not asking us to make the nexus of the agency decline to make, are you not? Or are you asking us to make that factual determination, as if we were wildlife scientists? I'm not asking you to make a factual determination. I'm asking you to uphold the biological opinion and the fishery restrictions as reflected in the interim final rule. By reaching a conclusion that the agency did not reach? What I am doing is I am highlighting evidence in the record which supports the agency's decision, so that you can have confidence that the decision in this case reflects a reasonable decision using the agency's expertise. Sort of continuing on this point, though, about the evidence that supports the connection, I would note that the way that the biological opinion uses the recovery plan is not just to emphasize the overall health and welfare of the sea lion population. That is certainly one aspect of the best available science that the recovery plan. But another element is the preservation of sub-regional populations. And I know Judge McEwen, you had asked the question, well, is a loss of one sub-regional population actually significant or not? And I would turn your attention to page 1281 of the excerpts of record, where the biological opinion states that the loss of a sub-regional population, quote, would be significant. In this instance, the biological opinion observes that not only has that western Aleutian sub-regional population declined by 45%, but if the action, if the fisheries had been authorized without change, it was the expectation of NIMS that that sub-regional population would not only decline beyond the 50% criterion that's highlighted in the recovery plan, but that it would actually diminish to the point of extirpation. Since I see I'm really short on time, can I maybe just address the two quick questions that Your Honors had posed? First, about the adverse modification regulation and the appreciable diminution standard. I don't think that this is just an instance of upholding the district court's legal interpretation of how an alternate approach might still satisfy the standard. I would also say that the facts that the district court highlighted are important to its finding that adverse diminution was happening in this instance, and those facts are set forth in the excerpts of record in Volume 6 at 1283 to 1284, and there the biological opinion says that critical habitat is basically prey, and it's our understanding, or it was NIMS's understanding, that prey was being diminished. I guess the final point that I'll talk about is the economic impact, and we already have some sense of the economic impact of these fisheries restrictions because all of last year the fishery operated under those restrictions, and as we point out in our brief at page 59 to 60, the record cite they're not record citations, but they're extra record citations that are appropriate for a discussion of remedy. Our brief discusses the fact that the Pacific Cod fishermen actually caught more fish in 2011 with the fishery restrictions in place than they did the previous year in 2010, and so that's not to belittle that there may be economic impacts from the interim final rule, but it is certainly not the ruination of the industry. Likewise, the Atka mackerel fishery continues to flourish, and therefore, if you're looking to consequences, I would suggest that the court, consistent with its precedent... Is this all in the administrative record? No. The details of... Well, these are extra... I don't understand how on appeal we can look to those for confirmation. Well, I think Judge Tallman's question was what is the impact, and to the extent that you are... The jeopardy in adverse modification evaluation is not one that has anything to do with economics, right? The record should be evaluated for whether or not the conclusions can be substantiated, and you don't determine jeopardy or adverse modification based on economic impacts to the industry. There's a separate question, which would be if this court, and I hope that you don't reach this issue, is inclined to vacate or inclined to remand without vacature. To the extent that you're weighing remedies, at that point, it is appropriate for the court to evaluate extra record information solely, not for the question of merits, but solely for the question of remedy, and in that instance, I would point out that we have a one-year track record, and the industry is doing fine, particularly the Pacific Cod industry. Thank you. I'm sure you have some comments on economics. I do, and I think what's important for the court to understand is that the fishing season that occurred in the EAR projected substantial losses of jobs, fishing revenue, and tax revenue to the state of Alaska, and we have actually operated for two fishing seasons under these measures. They went into effect on January 1st, 2011, and they're about to go in effect again on this upcoming January 21st, and I think what's important for the court to understand is there's a difference, a significant difference, between the conduct of the Atka Mackerel fishery and the Pacific Cod fishery. The Atka Mackerel fishery is very location dependent. It takes place only in the Aleutian Islands, so when the agency closed an entire fishery management area, 543, inside and outside of critical habitat, that is a permanent reduction in the amount of total allowable catch for the Atka Mackerel fishery, and I have this number of 40% in my head, but I'm not sure that's right, but anyway, it's substantial. The cod fisheries are managed as a single unit throughout the North Pacific because cod move around, so when they closed 543, 542, and big parts of 541 to cod fishing, it basically just gave people in other areas the opportunity to catch that cod, but there was still a substantial economic loss to the cod fishery because the reason that they fish in the Aleutian Islands, even though cod is only 3% of the biomass there, is that's where the larger and more valuable cod hang out. So these are the most fertile fishing areas? For cod, these are the most fertile fishing grounds, and for Atka Mackerel, they're the only fishing ground. How does this affect our decision under the relevant statute? It does not affect your decision whether the Jeopardy call was correct or not. I'm just answering the question about what's the practical implications, but I would like to return to the Jeopardy definition because I think that is what you're concerned with, and I'd like to address this issue of the use of sub-regions in the Jeopardy analysis. It's clear in the record that the Jeopardy and adverse modification determination is based solely on the decline in the Western Aleutians, but NIMS does agree that the Jeopardy and adverse modification determination has to be made at the DPS level. Where we part company with them is they say they had a rational basis to look at the declines in the Aleutians and project that that meant a bad thing for the DPS as a whole. Our case is that they did not have a rational basis to make that connection. They were speculating, and what I'd like to do is walk you through the layers of speculation. In its first speculation, NIMS theorized that the decline in the Western Aleutians would exceed 50%. It hasn't. It's at 45%. And then speculated, if it did exceed 50%, that would lead to extirpation of that sub-region. The biological opinion never found that that would occur. That's a litigation position. It next speculates that the central Aleutians sub-area, which is either stable or experiencing a non-statistically significant decline, would also start to decline at a significant rate. And it might pass 50%, and if it passed 50%, it might also be extirpated. And that would cause a violation of the recovery plans, no two adjacent sub-regions declining or being extirpated. The record supplies no reasonable basis for that speculation. Significantly, at the same time that you have a decline in the Western Aleutians, you have the core sub-populations in four out of the seven sub-regions actually increasing at what even the agency says is a robust rate of recovery. And NIMS never reconciles its speculation about the significant declines in the Western Aleutians with the idea that it will somehow lead to the robust rate in the biological opinion, it's actually pretty interesting, is defined differently. In one place, they define it as the 3% that's required for delisting. And in another place, they say it has to be more than 3%. So they're really, you know, they're holding these critters to a pretty high standard, which is completely inconsistent with what they've said is an acceptable rate of recovery in the recovery plan. The rate for the population as a whole, as I understand it, is averaging 1.4% It was at 1.4% at the time the biological opinion came out. And my last point is I'd like to turn to this central issue of, did they find causation? Is there enough of a linkage between the fisheries and stellar salience? I would direct the court's attention to page 345 of the biological opinion, because I think it really illustrates how the biological's key conclusion is based entirely on the perception that there may be potential harm in the future by the fisheries. And what it states at 345 in the fourth full paragraph, right above the regulatory conclusion, is that while fisheries cannot be unequivocally shown to be a causative factor in continued stellar salient declines in the Western portion, an adverse relationship may exist in the Western Aleutians and portions of the Central Aleutian. Competition may compromise food and may jeopardize and create adverse modification. And the possibility that this interaction may be one of several causes cannot be eliminated. And that's why we have to cause jeopardy. I don't think that's the standard under the law. Section 7 requires an affirmative finding that there is an effect of the action that causes some new risk of harm for the species. And that is what they did not find here because they could not find it based on this record. Thank you. Thank you. I would like to compliment all counsel, both for the arguments and also for the briefing. It's very comprehensive. And despite all the acronyms, very understandable. Thank you. Thank you. A little dictionary charts and dictionaries. So the this case, the state of Alaska versus Lipchenko is now submitted.
judges: Schroeder, McKeown, Tallman